IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

MICHELE ORR,                    )
                                )
Plaintiff,                      )
                                )
vs.                             )        No. 4:11-CV-64
                                )
CAROLYN W. COLVIN[1],           )
ACTING COMMISSIONER OF          )
SOCIAL SECURITY,                )
                                )
Defendant.                      )

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits to Plaintiff, Michele Orr. For the reasons set forth below, the Commissioner of Social Security's final decision is **AFFIRMED**.

BACKGROUND

Plaintiff, Michele Orr ("Orr" or "claimant"), first applied for Social Security Disability Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401 *et seq*., on May 7, 2002. Orr alleged that her disability began on September 1, 2000. Her claim was denied and she did not appeal.

Orr applied for benefits a second time on August 13, 2003.

---

[1]On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25, Carolyn W. Colvin is automatically substituted as the Defendant in this suit.

She again alleged that her disability began on September 1, 2000. The Social Security Administration denied her initial application and also denied her claim on reconsideration. On September 8, 2006, Orr appeared with counsel in Indianapolis, Indiana at an administrative hearing before Administrative Law Judge ("ALJ") James R. Norris ("Norris"). Orr, who was represented by counsel, testified. Testimony was also provided by Dr. Paul A. Boyce (a medical expert or "ME"), Dr. James M. Brooks, Ph.D., (also a ME), and Stephanie R. Archer (a vocational expert or "VE"). On December 11, 2006, ALJ Norris denied the claimant's DIB claim, finding that Orr had not been under a disability as defined in the Social Security Act.

The claimant requested that the Appeals Council review the ALJ's decision. The request was granted and the case was remanded for a second hearing. A second hearing was held before ALJ Norris on April 10, 2008, in Indianapolis, Indiana. At this hearing, Orr was again represented by counsel. Both Dr. Boyce and Dr. Brooks appeared and testified again. Gail K. Corn testified as a VE. Orr arrived late for the hearing but was offered an opportunity to testify. She choose not to offer further testimony. On December 16, 2008, ALJ Norris again denied Orr's DIB claim. Orr again sought review by the Appeals Council but the Appeals Council denied the request. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a)(2005).

The claimant has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

DISCUSSION

Orr was born on October 24, 1965, and was 42 on the date she was last insured. Orr alleges that she is disabled due to seizures or pseudosiezures, headaches, blackouts, bruising, non-coordination, memory loss, irritable bowel syndrome ("IBS"), hearing problems, low back pain, hypoglycemia, depression, degenerative disc disease, anxiety and post traumatic stress disorder ("PTSD"). (Tr. 158, 172). She has a GED. Orr has past relevant work as a school janitor. The medical evidence relating to Orr's various conditions can be summarized chronologically as follows:

In June of 2000, Dr. Zizar El-Khalili evaluated Orr and diagnosed PTSD, Obsessive-Compulsive Disorder ("OCD") and co-dependency traits. (Tr. 389-392). Dr. El-Khalili assigned a current Global Assessment of Functioning ("GAF") of 50.[2]

In August 2000, Orr saw a counselor and reported taking up to

_____

[2] GAF is a scoring system for measuring an individual's overall functional capacity. A GAF of 50 would represent serious symptoms or any serious impairment in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR,* 32-34 (4th ed. 2000).

three Ambien and three Tylenol PM at night and still not sleeping. (Tr. 490). She reported verbal, emotional, and physical abuse from her husband and was tearful, depressed, anxious, and she had limited insight and hand tremors. (Tr. 490).

A Computed Tomography Scan of Orr's lumbar spine on February 1, 2002, revealed "severe degenerative change" at L5-S1 with significant sclerosis and narrowing of the disc space. (Tr. 334).

A neurodiagnostic report also dated February 1, 2002, revealed "moderately diffuse high amplitude muscle artifact throughout the entire [EEG] tracing" which was, according to the report, "consistent with depressed anxious type individual." (Tr. 483-484).

Dr. Bernstain evaluated Orr in April of 2002 and opined that "it is likely that some, if not all, of her spells are non-epileptic in nature as a reaction to stress (conversion disorder)." (Tr. 313). Dr. Bernstain recommended Orr stop taking phenytoin and start taking Depakote. (*Id.*). Dr. Bernstain noted that the Depakote might control her seizures and chronic headaches and that it also had a mood stabilizing effect. (*Id.*).

In May of 2002, Orr went to the emergency room for treatment of a scalp contusion that she sustained during a pseudoseizure. (Tr. 318-320). The treating physician, Dr. Eppler, indicated that he doubted actual seizures and that Orr had a long history of pseudoseizures. (Tr. 320). In May of 2002, about a year after

Orr's seizures allegedly began, she spent two days being monitored at the IU Medical Center. (Tr. 306-308). She had reported seizures occurring on a daily basis lasting five to thirty minutes and sometimes resulting in urinary or bowel incontinence. (Tr. 306). During her stay, no abnormalities were noted, and no clinical signs of seizures were witnessed. (Tr. 307-308).

In July of 2002, Orr was seen at the Wabash Valley Mental Health Center. (Tr. 264). She was diagnosed with depression, panic with agoraphobia, and dependent personality disorder. (*Id.*). It was noted that she had functional limitations in her activities of daily living, concentration, persistence and pace, and adaptation to change. (*Id.*). The severity of those impairments was not rated. (*Id.*). She was again assessed a GAF of 50. (*Id.*).

On August 6, 2002, Orr attended a consultative exam with Dr. Streeter. (Tr. 296-299). She reported both chest pain and diarrhea. (*Id.*). She believed both problems were related to anxiety. (*Id.*). Dr. Streeter diagnosed "post traumatic generalized seizures of the past year" and "anxiety attacks." (*Id.*).

K. Neville, Ph.D, completed a Psychiatric Review Technique form on August 28, 2002. (Tr. 273-284). Dr. Neville determined that there was insufficient evidence at that time to find any medically determinable impairment. (Tr. 273).

In March of 2003, physician's notes[3] indicate Orr reported panic attacks and an inability to be around people. (Tr. 259).

On April 2, 2003, Orr saw Dr. Sekar regarding her IBS and she was started on Zelnorm. (Tr. 249). A gastroscopy and colonoscopy were recommended. (*Id.*).

X-rays of Orr's lumbar spine in April of 2003, following an ATV accident, showed degenerative disc changes with a vacuum joint at L5-S1, and no acute abnormalities in the sacrum or coccyx. (Tr. 252).

On April 23, 2003, Orr saw her physician and complained of depression, IBS, and poor sleep. (Tr. 258). She was encouraged to seek counseling. (*Id.*).

On August 8, 2003, Orr went to the emergency room complaining of constipation and no bowel movement for ten days. (Tr. 236-238). She was treated and released with medication on August 9, 2003. (*Id.*).

A Mental Status Exam was conducted on October 2, 2003, by Dr. Aido Buonanno. (Tr. 216-218). He diagnosed PTSD, Panic Disorder with agoraphobia, and Major Depression, recurrent, severe with psychotic features of auditory hallucinations of her parents. (Tr. 217).

In September of 2003, Orr completed a questionnaire about her

_____

[3]Unfortunately, it is not always clear from the record which physician was attending Orr.

headaches. (Tr. 109). She reported that the headaches occurred daily. (*Id.*). She also reported that seizures and stress from panic attacks contribute to her headaches. (*Id.*).

Orr saw Dr. Michael Kennedy on October 23, 2003. (Tr. 210-215). She was seeking disability, and indicated she had back pain, IBS, hypoglycemia and seizures. (*Id.*). According to Orr, she had had back pain for 10 years and her back pain was rated as 10 out of 10, 24 hours per day, 7 days a week. (Tr. 210). She had never had any treatment for her back at that time, but reported that she could sit comfortably for only 10 minutes, stand for 5 minutes, and walk for 7-8 minutes. (*Id.*). She appeared comfortable throughout the exam. (*Id.*). Dr. Kennedy diagnosed depression, anxiety, hypoglycemia, IBS and seizure disorder by history only, and noted that there was "no physical evidence of back disorder." (Tr. 214). Dr. Kennedy further noted the following:

> In regard to the workplace, claimant should be able to work 8 hours a day in a seated, standing or ambulatory position. She should be able to lift 30 pounds frequently and 40 pounds occasionally. She has full use of her upper bilateral extremities in terms of grasping, pushing, pulling or manipulating. She has full use of her bilateral lower extremities for operating foot controls. She should not work around moving machinery or operate automotive equipment. She should have no additional difficulties with working in extremes of temperature or humidity or with exposure to dust, fumes or gas. She can bend, squat, crawl. She should not climb.

(Tr. 214).

A Psychiatric Review Technique Form was completed on November 20, 2003, by F. Kladder, Ph.D., and later approved by W. Shipley, Ph.D. (Tr. 185-199). Dr. Kladder determined that Orr's impairments were not severe. (Tr. 185). He found that her functional limitations in the areas of activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace were "mild" and that she suffered no episodes of decompensation of extended duration. (Tr. 195).

On February 15, 2004, Orr went to the emergency room complaining of abdominal pain, nausea, vomiting and diarrhea. (Tr. 431-432). She was treated and released. (*Id.*).

On April 13, 2004, Orr saw her doctor and reported abuse from her husband. (Tr. 460). Orr saw the doctor again on April 23, 2004, and reported that she was out of her medication and that she had had two seizures since her last visit. (Tr. 456).

Orr saw a doctor again on July 15, 2004. (Tr. 442-443). She complained of abdominal pain. (*Id.*). She was in "quite a bit of emotional distress" and hid her eyes while talking. (*Id.*). It was recommended that she go to a women's shelter because of the abuse. (*Id.*).

X-rays of Orr's cervical spine in September of 2004 were normal. (Tr. 501-507).

In November of 2004, Orr was hospitalized for two days at Wabash Valley Mental Health Hospital. (Tr. 474-75). Orr was

admitted after suicidal thoughts. (*Id.*). She was stabilized, medicated, and released to a women's shelter. (*Id.*). She was diagnosed with partner relational problems, major depressive disorder, recurrent, and personality disorder with dependent and histrionic features. (*Id.*). Her GAF was assessed at 30.[4] A November 30, 2004, follow up visit included a diagnosis of major depression, recurrent, partner relational problems, physical abuse of adult, and personality disorder. (Tr. 473). Again her GAF was assessed at 30.

Orr saw her doctor in March of 2005 and again in June. (Tr. 518-519, 481). She reported that her OCD was getting worse. He noted myofascial pain and GERD. And, he wrote a note indicating that she has OCD and PTSD, that she "will not go to psychiatrist" and "need[s] disability ASAP." (*Id.*). She returned in September, and the doctor again noted myofascial pain, GERD and IBS. (Tr. 574). Her medications were refilled, and a blood test revealed that her Dilantin levels were not therapeutic. (Tr. 577).

In March of 2006, Orr reported that her seizures were occurring more often. (Tr. 589). She was tearful and had poor concentration during the exam. (*Id.*). Antidepressant medications were changed and counseling was recommended. (*Id.*).

---

[4]A GAF of 30 indicates the presence of hallucinations or delusions which influence behavior or serious impairment in ability to communicate with others or serious impairment in judgment or inability to function in almost all areas. *Diagnostic and Statistical Manual of Mental Disorders, DSM-IV)* 32-34 (4th ed. 2000).

In April of 2006, Orr saw a doctor for a medication check and reported increased seizures, increased stress, and increased compulsive behavior. (Tr. 588). Orr was diagnosed with chronic pain, depression OCD and seizures. (*Id.*). Again her Dilantin levels were subtherapeutic. (Tr. 604).

In May of 2006 Orr reported problems with vision in her left eye, worsening speech, headaches, depression and insomnia. (Tr. 585). Yet again her Dilantin levels were subtherapeutic. (Tr. 603).

Orr saw her doctor again on September 21, 2006. (Tr. 704). Orr reported that the Cymbalta prescribed previously was not helping and that she was not sleeping. (*Id.*). The doctor again recommended counseling. (*Id.*)

On November 8, 2006, Orr was seen in the ER after being found unresponsive following a seizure. (Tr. 761-763). She had been off her Dilantin for several days, and was given Dilantin at the hospital. (*Id.*). She also received a breathing treatment due to rhonchus breath sounds. (*Id.*).

Orr saw the doctor again on December 8, 2006, and again complained of sleep problems, anxiety, headaches and seizures. (Tr. 702).

On January 27, 2007, Orr was seen in the ER for a seizure, but she recovered remarkably fast. (Tr. 748-750). The assessment was possible seizure, subtherapeutic Dilantin level, and alcohol

intoxication. (Tr. 749).

On March 07, 2007, Orr was again at the ER reporting multiple seizures, anxiety and depression. (Tr. 739-741). No seizure activity was witnessed by the staff. (Tr. 739). Her affect appeared blunted and somewhat depressed. (Tr. 740). She was diagnosed with a seizure disorder and depression. (Tr. 741).

On March 22, 2007, Orr saw a doctor and complained of seizures, anxiety, insomnia, headaches and pain in her hips and back. (Tr. 717-718).

On April 20, 2007, Orr fell down stairs and hurt her back and head. (Tr. 719). She complained of pressure, severe headache, and blurry vision. (*Id.*).

On April 22, 2007, Orr was involved in a car accident. Approximately 36 hours later, Orr went to the ER. (Tr. 720-722). She reported headache, neck, back, chest, and abdominal pain. (*Id.*). She was diagnosed with acute neck and back strain, headache, multiple contusions, and a liver hemangioma on the right lobe of her liver. (*Id.*).

On May 16, 2007, Orr was taken to the ER by ambulance following reports of chest wall and flank pain, depression and anxiety. (Tr. 678). She again went to the ER on May 29, 2007. An ER report from the ER visit on May 29, 2007, notes that Orr had taken the ambulance to the ER twice in two weeks for seizure activity but that she admitted the visits were for anxiety attacks.

(Tr. 677-78). Orr was out of her medication. (*Id.*). It was noted that Orr was able to stop twitching when requested to do so by paramedics. (*Id.*). The impression was anxiety and tremors. (*Id.*). She was given Depakote and released. (*Id.*).

On November 7, 2007, Dr. Heroldt conducted a mental status exam and administered an MMPI-II. (Tr. 648-54). Orr reported symptoms of problems with energy, fatigue, concentration, feelings of worthlessness, self-esteem issues, and fleeting thoughts of suicide. (*Id.*). She reported excessive checking behaviors. Her memory was noted as "low average." (*Id.*). She had difficulty with simple calculations and could not complete serial 7s or 3s. (*Id.*). She exhibited significant psychomotor agitation. (*Id.*). She had flat affect. (*Id.*). On the MMPI-II, she tended to maximize her responses, and endorsed a large number and more severe symptoms than would be expected given her history and background, but the results were invalidated. (*Id.*). Dr. Heroldt diagnosed Bipolar I disorder, OCD Borderline Personality Disorder. (*Id.*). Dr. Heroldt rated Orr's GAF at 44.[5]

A physical residual functional capacity assessment dated November 25, 2007, by Dr. A. Lopez determined that no exertional, postural, manipulative, visual or communicative limitations were

---

[5] A GAF of 44 would represent serious symptoms or any serious impairment in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR,* 32-34 (4th ed. 2000).

necessary. (Tr. 202-209). Dr. Lopez did find that, based on Orr's seizure disorder, she should avoid hazards such as machinery and heights. (Tr. 206).

Orr saw the doctor on January 16, 2008. (Tr. 798). She indicated that she does not eat frequently because of anxiety and stress. (*Id.*). Her medications were refilled. (*Id.*).

During the time period outlined above, Orr has taken a variety of medications, including but not limited to the following: Dilantin, Celexa, Cymbalta, Lexapro, Depakote, Klonopin, Xanax, Amitriptyline, Atarax, and Trazodone.

Dr. Boyce testified at Orr's first hearing that, from a physical perspective, due to Orr's pseudoseizures, Orr should take standard seizure precautions, such as not working around unprotected heights or dangerous moving machinery. (Tr. 805-809). At the second hearing, Dr. Boyce considered the new evidence of record and stated that the new evidence did not change his opinion that Orr needs no exertional limitations but should avoid hazards and heights. (Tr. 833). He indicated that Orr should also avoid commercial driving and open bodies of water. (Tr. 838-839).

At Orr's first hearing Dr. Brooks testified (Tr. 809-821) that he felt that the medical record was somewhat unclear regarding the proper diagnoses for Orr, but that it "would support definitely some anxiety symptomatology and some depression." (Tr. 811). He also noted that there was a diagnosis of personality disorder with

dependent and histrionic features. (Tr. 815). And he further testified that someone with histrionic features "would talk a lot about their life stresses, their physical problems, medical problems, et cetera. It could have an impact in that some people will get tired of hearing that or be annoyed by it or - - so it could have some effects in terms of one's interpersonal social relationships, yes." (Tr. 816-17). According to Dr. Brooks, the medical evidence demonstrated psychological conditions, but not functional restrictions. (Tr. 820).

At Orr's second hearing, Dr. Brooks considered the new evidence in the record and noted the following:

> My view, in looking over this record is, this
> is a very hard one to judge because I think
> she's kind of shooting herself in the foot,
> so-to-speak, by dramatically over-reporting
> things. It's possible that she could have
> diagnoses that are actually valid and even
> could be at a listing level here, but she's so
> dramatic and ... I don't know how to make the
> judgment.

(Tr. 843). He concluded that there was no reason to change his previous opinion; namely, that there are psychological conditions but no functional restrictions. (*Id*.).

After reviewing the record, including the many different diagnoses, Dr. Brooks concluded that borderline personality disorder is "a very likely diagnosis." (Tr. 845, see also 851). Dr. Brooks further testified that with borderline personality disorders there is "lots of drama and crisis." (Tr. 845).

Individuals with borderline personality disorder generally have
difficulty working with others. (Tr. 849-50). He acknowledged
that some psychological diagnosis is, by necessity, based on self-
reports from the client, and he questioned the accuracy of Orr's
self-reporting. (Tr. 855). "Since she, apparently, apparently
dramatically over-reported symptoms on the MMPI then, you know, it
wouldn't be unreasonable to assume that she's also distorting the
history she gives. So I don't know if that's [referring to bipolar
disorder] a valid diagnosis or not." (Tr. 855). Based on the
record, Dr. Brooks believed that the only limitations Orr suffered
were due to the way she reacts to stress, and that Orr therefore
should not have substantial interaction with supervisors, coworkers
or the general public. (Tr. 848-854).

Orr's testimony at the 2006 hearing was quite brief. (Tr.
821-25). She testified that as a result of her Obsessive Compulsive
Disorder, she goes through a variety of rituals every day. (Tr.
821). This includes checking the stove and smoke detectors. She
also testified that she is afraid at night and that she has "been
through a lot of seizures." (*Id.*). She claimed that she had
memory difficulties. (Tr. 822). She testified that when she reads,
she needs to read over and over again because it looks backwards.
(Tr. 822-23). Orr testified that she does not go to church or
clubs, and does not go out to eat. (*Id.*). She also testified that
she had not driven a car in over two years; because of her seizures

she gave her car to her son. (Tr. 823). When she was living in a shelter, she did go to the grocery store, but she went with two other women. (Tr. 823). She testified that she could not go by herself because she was afraid. (Tr. 824). She testified to having a seizure while having blood drawn a couple weeks prior to the hearing. (Tr. 824). And, she testified to counting rituals; she counts everything. (Tr. 824-25).

The record also establishes that Orr is able to maintain personal hygiene and grooming, has lived alone at times, cooks, does laundry, cleans, washes dishes, sweeps, mops, dusts, mows the lawn, rides an all terrain vehicle, drives, watches television and movies, writes poetry, reads, manages her finances, shows, goes to taverns, and visits family. (Tr. 22).


<u>Review of Commissioner's Decision</u>

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id*. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, the Court shall examine the record in its entirety but shall not substitute its own opinion for

the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB under the Social Security Act, the claimant must establish that she is disabled. To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(1). To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1:    Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to step 2.

Step 2:    Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to step 3.

Step 3:    Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404 Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to step 4.

Step 4:   Is the claimant able to perform his past relevant work?
          If yes, the claim is denied; if no, the inquiry proceeds
          to step 5, where the burden of proof shifts to the
          Commissioner.

Step 5:   Is the claimant able to perform any other work within his
          residual functional capacity in the national economy: If
          yes, the claim is denied; if no, the claimant is
          disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v); *see also Herron v. Shalala*, 19
F.3d 329, 333 n.8 (7th Cir. 1994).

In this case, the ALJ found that Orr was insured through
December 31, 2007, and had not engaged in substantial gainful
activities from her alleged onset date through her date last
insured.   The ALJ also found that she suffered from the severe
impairment of a personality disorder with pseudoseizures.   The ALJ
considered whether Orr met or equaled a number of listed
impairments, but concluded that she did not.   The ALJ determined
that Orr retained the residual functional capacity ("RFC") to
perform a full range of work at all exertional levels with the
following nonexertional limitations: no work around unprotected
heights, dangerous moving machinery or large bodies of water; no
driving; and no substantial interaction with supervisors, coworkers
or the general public.   Based on this RFC, the ALJ found that Orr
could perform her past relevant work as a school janitor.   Thus,
Orr's claim failed at step 4 of the evaluation process.

Orr argues that the ALJ committed errors requiring reversal.
In fact, Orr finds error at every turn, taking a "kitchen sink"

approach to her request for review.  As the Seventh Circuit has noted, "the equivalent of a laser light show of claims may be so distracting as to disturb our vision and confound our analysis." *See United States v. Lathrop*, 634 F.3d 931, 936 (7th Cir. 2011). This Court has attempted to organize Orr's multiple arguments in a cogent manner, but the arguments are often overlapping and make any ordering of her arguments rather cumbersome.


## Whether the ALJ erred at step 2 by failing to find that certain impairments were severe

Orr claims that the ALJ's finding that she suffered no severe physical impairments was not supported by substantial evidence.  A finding that an impairment is severe is only a threshold finding that allows the case to proceed to the next step.  Where one impairment is deemed severe, it is not reversible error for an ALJ to fail to recognize other impairments as severe at step 2.  *See Arnett v. Astrue*, 676 F,3d 586, 591 (7th Cir. 2012)("[E]ven if there was a mistake at Step 2, it does not matter. Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment.").  Orr's arguments, however, even though stated in terms of a failure to find certain impairments severe, do not seem to be limited to alleging error at step 2.  Rather, she seems to assert that limitations regarding her physical impairments should have been

-19-

included in the RFC.  Those arguments will be addressed in a later section of this order.

## Whether the ALJ erred at step 3 by finding that Orr did not meet or equal any listing

As noted previously, step 3 of the five-step evaluation requires an ALJ to determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925, and 416.926)("the listings").  If Orr demonstrates that her impairments meet or equal the criteria of a listing, then Orr is disabled and the analysis does not continue to steps 4 or step 5.  Orr argues that the ALJ's finding that Orr did not meet the listings for seizure disorders is not supported by substantial evidence.  (DE 11 at 17-18).  Orr's argument is, however, almost wholly undeveloped.  Orr relies upon her statements that she has been fired for missing work due to seizures, that she has not always taken her seizure medication due to lack of funds, and that her seizures happen frequently (she's reported seizures as happening two times a day, daily, and four to five times per week). (*Id.*).  She also relies upon her ex-husband's statement that her seizure frequency depends on her stress and that headaches can occur more than twice a week.  (*Id.*).  Orr does not point to the language of any particular listing and, other than her broad allegation of a lack of substantial evidence, does not attempt to

demonstrate precisely how the ALJ's finding was in error. In fact, in her reply brief, Orr concedes that she "is not contending that she meets or equals a listing, but that due to the frequency of Ms. Orr's pseudoseizures and her problems maintaining appropriate behavior standards of competitive employment due to her psychological impairments, including her Personality Disorder, she would not be able to meet the demands of competitive employment." (DE 13 at 1). Based on her concession that she is not asserting that she meets or equals any listing, no further analysis of the ALJ's step 3 finding is necessary.

## Whether the ALJ inappropriately played doctor

Orr argues that ALJ Norris inappropriately "played doctor" by substituting his own medical judgments for that of the physicians. *See Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009)(finding that an ALJ impermissibly "played doctor" when he reached his own independent medical conclusions); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990)("[J]udges ... must be careful not to succumb to the temptation to play doctor.... Common sense can mislead; lay intuitions about medical phenomena are often wrong."). Orr has not limited herself to one claim of impermissibly playing doctor. Each claim will be addressed separately.

The ALJ's opinion states more than once that Dr. Brooks testified that the most accurate diagnosis for Orr is a personality disorder. (Tr. 18, 21). A review of Orr's medical records demonstrates that Orr has received many different diagnoses from many different physicians. Dr. Brooks testified that, in his opinion, Orr likely has a personality disorder. (Tr. 851). Orr claims that the ALJ cannot decide what diagnosis is most accurate. Orr asserts that her treating sources must decide that. Orr's argument ignores the important fact that ALJ Norris did not come to this conclusion on his own; he based it on the testimony of Dr. Brooks, a ME, who had reviewed her file. And Dr. Brooks was not the only physician to suggest that Orr suffered from a personality disorder. Orr was diagnosed with a dependent personality disorder in 2002 (Tr. 264), a personality disorder with dependent and histrionic features in 2004 (Tr. 474-75), and a borderline personality disorder in 2007 (Tr. 448-54). While this Court agrees that ALJ Norris could not have concluded that the most accurate diagnosis for Orr was "personality disorder" without a medical opinion on which to base his conclusion, he had such an opinion. In this circumstance, it is hardly fair to say he is "playing doctor." Rather, he is relying on Dr. Brooks, a physician whose ultimate conclusions regarding Orr's functional limitations is not favorable to Orr. Orr, of course, take issue with the opinion of

Dr. Brooks, too.[6]

Perhaps a bigger problem with Orr's argument is that it is not clear that Orr was in any way harmed by the diagnosis of personality disorder being credited over that of other diagnoses. *See Estok v. Apfel*, 152 F.3d 636, 639 (7th Cir. 1998)(demonstrating that a diagnosis alone is not probative evidence of disability or the limitations caused by an impairment where the physician who provided the diagnosis gave no opinion regarding the severity of the condition or its impact on the individual's functional capacity). The ALJ did not commit reversible error in relying on Dr. Brooks' testimony to find that the most accurate diagnosis for the claimant was a personality disorder.

The ALJ's rejection of the opinion of Dr. Heroldt

Orr argues that the ALJ's doctor playing led him to improperly reject the opinion of Dr. Heroldt. Dr. Heroldt administered the MMPI-II and opined that Orr suffered from bipolar disorder, OCD and Borderline Personality Disorder. Despite Orr's invalid MMPI profile, Dr. Heroldt still found those diagnoses applicable, but the ALJ did not. The ALJ adequately explained his reason for this; it was his aforementioned reliance on Dr. Brooks' opinion that many

---

[6] Orr notes that MEs cannot perform exams during the hearing and that, although Dr. Brooks did not conduct an exam, "his extensive testimony about why he believed the medical records were wrong and what Ms. Orr really should have been diagnosed with is the equivalent of conducting an examination and should not be permitted." (DE 13 at 4). Orr's argument is unconvincing. A review of the transcript does not reveal that the equivalent of a medical examination occurred at either of Orr's hearings. (Tr. 802-863). Furthermore, Orr has cited to no law that demonstrates that Dr. Brooks did anything inappropriate.

of Orr's diagnoses were based on Orr's self reports, her self reports were not particularly reliable, and the record as a whole suggested that borderline personality disorder was a likely diagnosis. (Tr. 21, 845).

As pointed out previously, the better question is whether the rejection of Dr. Heroldt's diagnoses matters. The functional limitations imposed by an impairment are more important that the label given to an impairment. Whether the ALJ calls it manic-depressive disorder, OCD, borderline personality disorder, or something else, the functional limitations are the same. The ALJ did not error in accepting the opinion of the ME that the most accurate diagnosis was a personality disorder, where the limitations imposed would have been the same no matter what label was applied to the condition.

The ALJ's comments about Orr's Dilantin levels

Orr argues that the ALJ focused on the fact that her Dilantin levels were not therapeutic but, if what she suffers from is pseudoseizures, then the Dilantin levels are irrelevant and therefore not an appropriate consideration for the ALJ. Orr characterizes this too as "playing doctor." Orr's brief refers to page 24 of the record to support his statement that the ALJ focused on the nontherapeutic Dilantin levels, but in fact, page 24 contains only one passing mention of Orr being off her Dilantin for five days. This is part of the ALJ's summary of the evidence regarding her pseudoseizures, and there is nothing inappropriate about it. The portion of the opinion cited to by Orr simply does

not demonstrate, as Orr suggests, that "[t]he ALJ's focus on Dilantin levels is another example of him playing doctor and making judgments about what he thought should be in the file..." (DE 11 at 18).


## Whether error results from the ME's statement regarding a lack of an abnormal EEG

Orr notes that Dr. Boyce made a factual error in his statement that there were no abnormal EEGs in the file. (Tr. 805-806). According to Orr, the February 1, 2002, EEG shows abnormalities. (Tr. 483-484). The EEG report says that:

> the patient has moderately diffuse high amplitude muscle artifact throughout the entire tracing. Interpretable portions demonstrate a normal wake background. No diagnostic abnormalities are seen. There is diffuse increased muscle artifact to be consistent with depressed anxious type individual.

(*Id.*). If the transcript is read in its entirety, it is clear that Dr. Boyce is discussing whether there is any evidence of record that she suffers from seizures as opposed to pseudoseizures. Whether this report is "abnormal" or not is besides the point. It did not show seizure activity and this contributed to Dr. Boyce's conclusion that Orr suffers from pseudoseizures. (Tr. 806).


## Whether the ALJ's credibility determination is patently wrong

Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is patently wrong. *Skarbek v. Barnhart*,

390 F.3d 500, 504 (7th Cir. 2004).   However, when a claimant produces medical evidence of an underlying impairment, the ALJ may not ignore subjective complaints solely because they are unsupported by objective evidence.  *Schmidt v. Barnhart*, 395 F.3d 737, 745-47 (7th Cir. 2005); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Clifford v. Apfel*, 227 F.3d 863, 871-72 (7th Cir. 2000)).  "In assessing a claimant's credibility, the ALJ must consider subjective complaints of pain if the claimant can establish a medically determined impairment that could reasonably be expected to produce the pain."  *Indoranto*, 374 F.3d at 474 (citing 20 C.F.R. § 404.1529, SSR 96-7p; *Clifford*, 227 F.3d at 871).  Further, "the ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence."  *Id.*  Instead, the ALJ must make a credibility determination supported by record evidence and be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight given to the claimant's statements and the reasons for that weight.  *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

In evaluating the credibility of statements supporting a Social Security application, the Seventh Circuit Court of Appeals has noted that an ALJ must comply with the requirements of Social Security Ruling 96-7p.  *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).  This ruling requires ALJs to articulate "specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or

that "the allegations are (or are not) credible." SSR 96-7p.
Furthermore, the ALJ must consider specific factors when assessing
the credibility of an individual's statement including:

    1.   The individual's daily activities;

    2.   The location, duration, frequency and
         intensity of the individual's pain or other
         symptoms;

    3.   Factors that precipitate and aggravate the
         symptoms;

    4.   The type, dosage, effectiveness, and side
         effect of any medications the individual takes
         or has taken to alleviate pain or other
         symptoms;

    5.   Treatment, other than medication, the
         individual receives or has received for relief
         of pain or other symptoms;

    6.   Any measures other than treatment the
         individual uses or has used to relieve pain or
         other symptoms; and

    7.   Any other factors concerning the individual's
         functional limitations and restrictions due to
         pain or other symptoms.

SSR 96-7p; *see also Golembiewski v. Barnhart*, 322 F.3d 912, 915-16
(7th Cir. 2003). Orr makes two separate arguments for why the ALJ's
credibility determination is erroneous. Each is considered in
turn.

     <u>Orr's tendency to exaggerate as a function of her impairment</u>
     ALJ Norris discounted Orr's credibility because he believed
she was exaggerating, but exaggeration was a symptom of the very
impairment that the ALJ found she suffered from: a personality
disorder. Dr. Brooks testified that "borderline personality
disorder is known for individuals who get into all kinds of crises

-27-

and interpersonal conflicts and they get all kinds of different diagnoses" but "nothing seems to help." (Tr. 845). Orr argues that discounting her credibility due to symptoms of an impairment which the ALJ acknowledges is unfair.

The United States District Court for the Northern District of Illinois considered and rejected a similar argument in *Rojas v. Astrue*, No. 09-C-5587, 2010 WL 4876698, *7 (Nov. 19, 2010). In *Rojas*, the court considered a claimant with a personality disorder whose allegations were inflated. The ALJ had discredited the claimant's testimony, and counsel argued that the ALJ erred by failing to consider whether the claimant's testimony was a symptom of his personality disorder. In response, the court noted that the ALJ did not deny that the claimant had a personality disorder:

> But the fact that [the claimant's] personality disorder might cause him to offer far reaching testimony, and manipulate people and situations does not mean that he gets a pass for offering outlandish testimony. There is no precedent or law that requires an ALJ to overlook a claimant's unbelievable testimony when his compulsion to exaggerate may be caused by a mental impairment.

*Id.* Just as in *Rojas*, the ALJ was entitled to consider Orr's compulsion to exaggerate, whether caused by a mental impairment or not, in weighing the credibility of her statements.

## The ALJ's reliance on meaningless boilerplate

Orr is also critical of the ALJ's credibility determination because the ALJ relies on "boilerplate" that has been criticized by the Court of Appeals for the Seventh Circuit. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Bjornson v. Astrue*, 671

F.3d 640, 645 (7th Cir. 2012).  The ALJ stated the following regarding Orr's credibility:

> After consideration of this evidence, the claimant s [sic] medically determinable impairments could cause the alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the overall evidence of record (20 CFR 404.1529(c) and Social Security Ruling 96-7p).

(Tr. 21).

The ALJ, relying on the testimony of Dr. Brooks, noted that Orr's self-reports were "overly dramatic" leading to multiple diagnoses, as is consistent with the behavior of someone with a personality disorder. (Tr. 21).  The ALJ noted the invalid MMPI-II.  (*Id.*).  The test was invalid because of extremely elevated scales; Orr endorsed almost every psychological symptom and dramatically overstated her symptoms. (*Id.*).  The ALJ considered Orr's activities of daily living. (Tr. 22).  With regards to back pain, the ALJ noted that Orr reported back pain at a consultive examination as 10 out of 10 on a pain scale but appeared comfortable throughout the exam.  (Tr. 23).  He reviewed the history of treatment for Orr's IBS and noted that it appeared to be generally well controlled.  He considered Orr's reports of frequent headaches, and noted the lack of objective signs and treatment.  And, the ALJ considered Orr's pseudoseizures, including the fact that she was monitored in the ER and no seizure activity was witnessed.  He concluded that Orr clearly "is not having nearly as many seizures as reported."  (Tr. 24).  The ALJ specifically

acknowledged that Orr's exaggeration of her symptoms was consistent with a personality disorder. (Tr. 25). The ALJ noted the inconsistencies between Orr's reports that her panic attacks are worse if several people are around and her reports of her social activities. (Tr. 25). The ALJ considered whether other measures were taken for relief of pain or other symptoms; none were noted in the record. (Tr. 26). He also noted that "no physician has concluded the claimant was unable to work at any time through her date last insured."[7] (Id.). Accordingly, the ALJ stated that:

> purely subjective complaints have been afforded weight to the extent that they are reasonably consistent with the overall evidence in the record. When subjective allegations are not reasonably consistent with the overall evidence of record, as here, they have been given little to no weight in assessing the claimant's residual functional capacity as they are not considered to be credible.

(Tr. 26).

The boilerplate language utilized by ALJ Norris is undoubtedly unhelpful. And, where such language is used without any further discussion of the reasons that justify the ALJ's credibility determination, then reversal is warranted. But here the ALJ considered the factors outlined in SSR 96-7p and supported his

---

[7] Orr is critical of the ALJ for making this statement. Orr correctly notes that the determination of whether claimant can work is reserved for the Commissioner. 20 C.F.R. 404.1527(e). He indicates that the absence of such a statement is "non-binding." But the ALJ was certainly entitled to consider this fact, and there is nothing in the record that indicates ALJ Norris felt that, in the absence of such an opinion, he could not reach a finding that Orr was disabled. Interestingly, even though physician's opinions regarding disability are "nonbinding", counsel for Orr is quick to point out that a physician at Tippecanoe Community Health Clinic wrote that Orr "need[s] disability ASAP" on June 13, 2005. (Tr. 481). This comment, too, is non-binding. The ALJ's statement is not cause for reversal.

findings that Orr lacked credibility with substantial evidence from the record; namely, repeated examples of Orr exaggerating her symptoms.

## Whether the ALJ's RFC determination is supported by substantial evidence

Orr believes that the ALJ's RFC determination is not supported by substantial evidence. Orr's argument in this regard are many and varied, although for the most part underdeveloped. Most of Orr's arguments would require the ALJ to accept Orr's testimony regarding her symptoms, and it has already been determined that the ALJ's credibility determination is supported by substantial evidence.

Orr argues that the ALJ did not include any limitations regarding attendance problems in his RFC and that her seizures will result in absences from work and/or limitations in her ability to sustain regular activities. Orr points to no medical sources that opines she would need to miss work due to her pseudoseizures. And, to the extent this limitation is based on Orr's testimony, the ALJ has rejected her testimony regarding the frequency of her seizures.

Orr also argues that the ALJ erred in finding that she suffers only mild restrictions in her activities of daily living ("ADLs"). She concedes that she cooks and cleans, watches TV and engages in other ADLs, but argues that the ALJ did not consider the quality and frequency of her engagement in those activities. For example, according to Orr, she does laundry but does it slowly and cooks

only in the microwave or slow cooker.  Again, the ALJ found her testimony not credible.  Furthermore, Orr points to no medical source that has imposed limitations in her ADLs that are greater than those recognized by the ALJ.

The ALJ stated that "it is reasonable to infer that the mental activities pursued in leisure time could also be pursued in a work setting" unless there is an apparent reason not to believe this. (Tr.22).  Orr asserts that this statement is contrary to law. Undoubtedly, the ability to do ADLs at home is not the same as ability to work.  *See Bjornson*, 671 F.3d at 647 (7th Cir. 2012)(referring to ALJ's failure to recognize the differences between the ability to engage in activities of daily living and activities in a full-time job as a "recurrent, and deplorable, feature of opinions by administrative law judges."); *see also Spiva v. Astrue*, 628 F.3d 346 (7th Cir. 2010)("[T]he mental and physical capabilities that a person employs in his nonworking hours are relevant to his ability to work.  But an ability to engage in 'activities of daily living' (with only mild limitations) need not translate into an ability to work full time.").  But ALJ Norris did not equate Orr's ADLs with the ability to work.  He specifically acknowledged that, in this case, there could not be a one-to-one comparison of mental activities pursued in leisure to mental activities performed at work.  (Tr. 22).  The ALJ did not place any undue weight on this factor, but weighed it in the same manner as the other evidence.  (*Id.*).

Orr also argues that the ALJ's finding that she suffered no

more than moderate difficulties with social functioning was not supported by substantial evidence. The ALJ attributes Orr's limitation in social functioning to her pseudoseizures, which are a reaction to stress. According to Orr, having pseudoseizures at work would be distracting and would affect her ability to sustain work. Orr also notes her testimony that she is afraid to leave the house. (Tr. 216-218). Once again, the ALJ discredited Orr's testimony. Orr cites to no source that has indicated that greater limitations in social functioning are warranted.

According to Orr, the ALJ also erred in finding that she suffered only mild difficulties with concentration, persistence, or pace. Orr points to a mental status exam in October of 2003 where she could only recall two of three items after a 15-minute delay and could not complete serial sevens. (Tr. 216-218). She also points to an inpatient stay in November of 2004 where difficulty with memory and concentration was noted. (Tr. 474-475). Again, at a mental status exam in October of 2007 Orr was unable to complete serial sevens or threes and had difficulty with simple calculations. (Tr. 648-654). Based on this, Orr notes that substantial evidence shows Orr had difficulty with memory and concentration. That is not the question before this Court. This Court does not consider whether substantial evidence could support a conclusion opposite to the ALJ's conclusion, but whether the conclusion the ALJ reached is supported by substantial evidence. Unfortunately for Orr, the ALJ's determination that she suffered only mild difficulties with concentration, persistence, or pace was

supported by substantial evidence.

Orr also argues that the ALJ's RFC should have included limitations related to her physical impairments other than the basic seizures limitations of avoiding unprotected heights, dangerous moving machinery, large bodies of water, and driving. According to Orr, the ALJ found that there was "no physical evidence of a back disorder." (Tr. 23). The ALJ's comment is made in the context of a particular exhibit. During the October 2003 consultative examination with Dr. Kennedy, Orr reported back pain at ten out of ten on a pain scale, but appeared completely comfortable. (Tr. 210-214). Dr. Kennedy reported "no physical evidence of a back disorder." The ALJ does not make the sort of broad categorization of a complete lack of any evidence whatsoever that Orr's brief suggests. X-rays did show degenerative changes. (Tr. 334; 252). She was treated for pain. (Tr. 481,518, 577, 588). Nonetheless, this Court cannot say that the ALJ's conclusion that there is no evidence that Orr's back impairment more than minimally interfered with her ability to work is without substantial evidence.

To the extent Orr is arguing that the ALJ's RFC should have included limitations as a result of her IBS, that argument fails. Orr relies on her own testimony and self reports to establish that she complained of frequent nausea and diarrhea due to anxiety (Tr. 296-299), complained of diffuse abdominal pain, bloating and constipation (Tr. 249), and reported use of enemas (Tr. 210-215). Orr argues that these symptoms could interfere with ability to

work.  Certainly they could, but the ALJ gave good reasons for finding that they did not.  (Tr. 23).

Orr also seems to argue that the ALJ erred in finding that her headaches did not require that additional limits be included in her RFC.  Orr notes her many complaints of headaches in the record. The ALJ considered her testimony and the objective medical evidence and concluded that there was no evidence that her headaches would more than minimally interfere with her ability to work.  (Tr. 23-24).  His reasons are well stated, and this Court cannot say that his conclusion is not supported by substantial evidence.

Orr also argues that the ALJ erred by failing to discuss the need for extra breaks to recover from pseudoseizures or any discussion as to why the ALJ feels those are not necessary.  But, the ALJ rejected Orr's testimony regarding the frequency of her pseudoseizures, that decision was supported by substantial evidence, and Orr cites to no medical opinion of record indicating she needed breaks to recover from pseudoseizures.  The ALJ did not err by failing to include this limitations in his RFC.


Whether the ALJ's phrasing of Orr's restrictions due to her psychological impairments adequately conveyed his meaning to the VE

Orr argues that the ALJ failed to defined her social limitations in "meaningful vocational terms." (DE 11 at 23).  The entirety of Orr's argument in this regard is that the ALJ's limitation of Orr to "'no substantial interaction' [with supervisors, coworkers or the general public] is a vague

restriction and does not give the vocational expert specific information to make his assessment." (*Id.*).  The ALJ's RFC states that Orr should have "no substantial interaction with supervisors, coworkers or the general public."  (Tr. 20).  This was based on the opinion of Dr. Brooks.  The VE listened to Dr. Brooks' testimony.  (Tr. 858).  The ALJ clarified that the VE heard Dr. Brooks' testimony with respect to interactions with other people and then asked the VE if any of Orr's past relevant work fit within the restrictions set forth by Dr. Brooks.  (Tr. 858-59).  The VE opined that the janitor position would qualify.  The ALJ clarified that the contact with others would be "coincidental" and the VE agreed.  (Tr. 859).  A review of the transcript reveals that the VE was fully apprised of the intended limitations regarding social functioning as defined by Dr. Brooks and as set forth in the RFC.  This is not, as Orr suggests, a case where the limitations found were inadequately conveyed to the VE.

## Whether the ALJ erred in determining that Orr could return to her past relevant work as a janitor

In addition to counsel's argument about the uncertainty of whether the social contact in the job of janitor would be substantial, Orr argues that her pseudoseizures would make her a safety risk for the performance of this job.  She concedes, however, that the VE testified that the hazards of the janitor job do not exceed those that Dr. Boyce indicated would apply.  And, Orr fails to tell this Court what these "other hazards" are.  This

Court will not develop the parties arguments for them. *Vaughn v. King*, 167 F.3d 347, 354 (7ᵗʰ Cir. 1999)("It is not the responsibility of this court to make arguments for the parties.").


## Whether the ALJ's application of *Res Judicata* requires reversal

Orr's first application, filed May 7, 2002, was denied and not appealed. The ALJ determined that there was no reason to reopen that determination; it was *res judicata.* (Tr. 15). Accordingly, Orr's claim was evaluated as of September 3, 2002, the day after the previous denial. (*Id.*). Orr alleges that the ALJ improperly applied *res judicata.* Her reasoning is that she listed medical sources during the period covered by the first application that were not considered previously and she alleged different impairments in the new application. 20 C.F.R. § 404.989 provides that a case will be reopened if there is good cause, and that good cause exists when there is new and material evidence. Orr does not sort out what is new, give the court citations to where those exhibits appear in the record, indicate which of new evidence pertains to the period prior to September 3, 2002, or make any argument as to why the new evidence is material. Orr only cites generally to the explanations of determination for the two applications. (Tr. 47 and 59). This Court will not develop Orr's arguments for her. Furthermore, it does not appear that this Court has jurisdiction to review this decision. *See Califano v. Sanders*, 430 U.S. 99, 107-08 (1977); *Johnson v. Sullivan*, 936 F.2d 974, 976 (7ᵗʰ Cir. 1991).

-37-

CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **AFFIRMED**.

DATED: March 22, 2013                    /s/ Rudy Lozano, Judge
                                         United States District Court